FILED

AUG 26 2008

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

POSTED ON WEBSITE

<u>NOT FOR PUBLICATION</u>

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

In re ) Case No. 04-12017-B-7
)
Ric J. Squaglia, )
)
)
Debtor. )
_____)

**MEMORANDUM DECISION REGARDING APPLICATION
FOR COMPENSATION OF TRUSTEE'S ATTORNEY**

This memorandum decision is not approved for publication and may not be cited except when relevant under the doctrine of law of the case or the rules of res judicata and claim preclusion.

Before the court is an application for professional compensation (the "Application") filed by Jeffrey L. Wall, Esq. ("Wall"). Wall performed services in this case as the attorney for James E. Salven, chapter 7 trustee (the "Trustee"). This bankruptcy case has been fully administered and the Application was filed in conjunction with the Trustee's final report. For the reasons set forth below, the Application will be denied.

This memorandum decision contains the court's findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a), made applicable to this contested matter by Federal Rule of Bankruptcy Procedure 7052. The court has jurisdiction over this matter under 28 U.S.C. § 1334 and 11 U.S.C. § 330[1] and General Orders 182 and 330 of the U.S. District Court for the Eastern District of California. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A).

**Background and Findings of Fact.**

This bankruptcy commenced under chapter 7 in March 2004. The Debtor's schedule of assets includes a parcel of real property located at 4135 West Los Altos in Fresno, California (the "Residence"). There were no nonexempt assets in the schedules and the case was originally noticed to creditors as a "no-asset" case. The Debtor's discharge was entered without objection in June 2004. As a "no-asset" case, the Trustee would have filed his final report and the case would have closed shortly thereafter. Had the Trustee closed the case as a no-asset case, he would have received a fee of $60.

The Section 341 meeting of creditors was concluded in May 2004. The Trustee apparently questioned the Debtor regarding his interest in the Residence. Shortly thereafter, the Trustee filed his "Report of 341 Meeting" informing the court that he had discovered nonexempt assets in the estate (the "Asset Notice") and in September 2004, the Trustee requested authority to employ Wall as his general counsel. The court infers that the Asset Notice was a result of the Trustee's conclusion that he could sell the Residence and recover some money to pay creditors. The clerk issued a Notice to File Proof of Claim Due to Possible Recovery of Assets to all scheduled creditors. Seven creditors filed priority and unsecured claims.

---

[1] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9036, as enacted and promulgated *prior* to October 17, 2005, the effective date of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, Apr. 20, 2005, 119 Stat. 23.

2

**Wall's Fees and the Adversary Proceedings Against Mary Reid.**

Wall's employment was approved on September 15, 2004. Immediately thereafter, Wall prepared and filed an adversary proceeding against Mary Reid (formerly Mary Squaglia)[2] for injunctive relief, purportedly to compel Ms. Reid to cooperate with the Trustee in his efforts to sell the Residence (the "First Adversary Proceeding"). The Debtor then converted the bankruptcy case to chapter 13 for a brief period, which divested the Trustee of any power to sell the Residence. The First Adversary Proceeding produced nothing for the bankruptcy estate. The Residence was not sold. After the case was converted to chapter 13, the First Adversary Proceeding was dismissed by stipulation of the parties. Wall requests fees in the amount of $1,540 for work related to the First Adversary Proceeding.

The Debtors failed to file a chapter 13 plan and the case was soon reconverted to chapter 7. The Trustee was reappointed in February 2005. Wall then conducted an examination of the Debtor under Rule 2004 to determine if there were any accounts receivable to collect from the Debtor's business (the Debtor was a practicing attorney). The Application does not explain why the Trustee required the services of an attorney to examine the Debtor regarding potential assets. However, that effort produced nothing for the bankruptcy estate. Wall requests fees in the amount of $800 for work related to the search for assets.

Soon after the case reconverted to chapter 7, Wall prepared and filed another adversary proceeding against Mary Reid, this time seeking to sell the Residence, over Mary Reid's objection, pursuant to § 363(h) (the "Second Adversary Proceeding"). The Second Adversary was voluntarily dismissed by stipulation of the parties on July 13, 2005. In Wall's words, "After a fair amount of discovery, the trustee and I concluded the math did not work in the estate's favor in light of the value of the property and the

---

[2] The three adversary proceedings discussed hereinafter were filed against Mary Squaglia. Defendant responded to the second adversary proceeding as Mary Reid.

Trustee's own estimate of what he would have to spend in legal fees to get a court order under Section 363(b) [sic]."[3] The Application does not explain what "discovery" led the Trustee to abandon the Second Adversary Proceeding, or why the Trustee could not have "done the math" before hiring Wall to file the Second Adversary Proceeding in the first place. Again, this effort produced nothing for the bankruptcy estate. Wall requests fees in the amount of $2,000 for work relating to the Second Adversary.

**The Lien Avoidance Motion.**

In November 2005, the Debtor brought a motion to avoid several judicial liens against the Residence pursuant to § 522(f) (the "Lien Avoidance Motion").[4] The Debtor and his wife, Mary Reid, had been separated since 1996. It was not clear from the record if their marriage had been formally dissolved. Ms. Reid and the children resided in the Residence, but the Debtor did not. The Debtor and Ms. Reid submitted an appraisal in support of the Lien Avoidance Motion which valued the Residence at $225,000 as of the petition date.[5]

According to documents filed in opposition to the Lien Avoidance Motion, the Debtor and Ms. Reid acquired the Residence from the California Department of Veterans Affairs ("Cal-Vet") in 1989, before they were married. The Debtor's interest in the Residence was immediately assigned to himself and Ms. Reid, as "husband and wife, as joint tenants." The Debtor claimed a $75,000 "family unit" homestead exemption for his

---

[3] See Wall's Expanded Narrative Report Re: Application for Payment of Final Fees and/or Expenses filed on April 14, 2008.

[4] The facts involving the Lien Avoidance Motion are adopted from this court's Memorandum Decision Regarding Motion to Avoid Judicial Liens filed on September 29, 2006.

[5] The Debtor valued the Residence in his schedules at $135,000. In his pleadings, the Debtor later valued the Residence at $292,000 based on a purported offer which the Trustee obtained to sell the Residence. However, it is not clear when that offer was obtained. The proper time to value property for the purpose of the Lien Avoidance Motion is the date of commencement of the bankruptcy, March 10, 2004. (See *In re Dore*, 124 B.R. 94, 96 (Bankr. S.D.Cal. 1991)).

interest in the Residence pursuant to California Code of Civil Procedure § 704.730(a)(2). There were no objections and the homestead exemption became final. Debtor sought to avoid four judicial liens which totaled more than $71,000 (the "Judicial Liens") on the grounds that the Judicial Liens impaired his homestead exemption. All of the Judicial Liens were recorded solely against the Debtor and appeared to be the Debtor's separate liabilities. Other evidence submitted in opposition to the Lien Avoidance Motion, showed that the Residence was subject to a senior debt to Cal-Vet in the approximate amount of $59,000 at commencement of the case. The Residence was also subject to unavoidable tax liens in the approximate amount of $46,000. The Debtor and Ms. Reid filed separate tax returns during their marriage and the taxes appeared to be the Debtor's separate obligation.

On September 29, 2006, this court issued a Memorandum Decision granting the Lien Avoidance Motion (the "522(f) Ruling"). In that Ruling, this court ruled that the value of the Residence did not exceed $225,000. The court also ruled that the Debtor and Mary Reid owned the Residence as joint tenants, as opposed to community property. The effect of that ruling meant that only one-half of the Residence was property of the bankruptcy estate. The court found that the value of Debtor's interest in the Residence ($112,500) did not exceed his share of the Cal-Vet lien ($29,500), plus the tax lien ($46,000) and the homestead exemption ($75,000). Based thereon, the court ruled that the Judicial Liens (which only attached to the Debtor's one-half interest) impaired the homestead exemption and avoided the judicial liens pursuant to § 522(f). The effect of that Ruling meant that there was no "nonexempt" equity in the Debtor's one-half interest in the Residence. Ergo, there was nothing in the Residence for the Trustee to sell for the benefit of unsecured creditors. A copy of the 522(f) Ruling was served on the Trustee.

**The Third Adversary Proceeding and the Settlement.**

After the Debtor successfully prosecuted the Lien Avoidance Motion, three months after the court issued the 522(f) Ruling, the Trustee decided to sue Mary Reid again, purportedly in another effort to sell the Residence. Wall prepared and filed yet a

5

third adversary proceeding against Ms. Reid seeking to sell the Residence pursuant to § 363(h) (the "Third Adversary Proceeding").  Wall requests $200 for legal services (one hour) in relation to preparation of the Third Adversary Proceeding.

Immediately after the Third Adversary Proceeding was filed and served, the Trustee began negotiations with Ms. Reid and the Debtor which eventually lead to a settlement.  The Debtor agreed to pay the estate $7,500 in exchange for a dismissal of the Third Adversary Proceeding and a promise by the Trustee to cease any further efforts to sell the Residence (the "Settlement").  Wall requests $1,500 for services related to negotiation and approval of the Settlement.

On June 13, 2007, the Trustee brought a motion to approve the Settlement.  In support of the motion, the Trustee filed a declaration stating that the proposed Settlement "is fair and reasonable, and is in the best interest of the Estate and its creditors."  The motion did not disclose that the administrative expenses incurred to obtain the Settlement in the first place exceeded the value of the Settlement and that the Trustee and Wall were the only persons who would benefit from the Settlement.

At the hearing on this Application, the court asked Wall about the merits and motive for filing the three adversary proceedings against Ms. Reid.  Specifically, the court inquired as to what investigation and analysis Wall conducted or reviewed prior to performing the services for which he seeks compensation.  Wall responded, in essence, that he did not do any analysis of the Debtor's interest in the Residence or its value to the estate.  He performed all of the work solely at the direction of the Trustee.  When the court asked what analysis the Trustee had done before "directing" Wall to perform services, Wall was unable to answer the question.  Finally, when the court asked why the Trustee decided to pursue the Third Adversary Proceeding after dismissing the Second Adversary Proceeding and after the court had issued the 522(f) Ruling, Wall simply stated, without explanation, that the Trustee still "believed" the Residence had some value to the estate.

///

**The Trustee's Final Report.**

The Trustee's Final Report and Proposed Distribution to creditors was filed on February 27, 2008 (the "TFR"). The TFR reveals that the Debtor paid the Settlement ($7,500), which was the only asset recovered by the Trustee, all other assets being either worthless or exempt.[6] The Trustee requests compensation in the amount of $1,503.15 based on the statutory formula in § 326(a), plus costs in the amount of $668.41. In this Application, Wall requests compensation for legal fees in the amount of $6,617.50 (34.4 hours at the average rate of $192.37 per hour), and reimbursement of expenses in the amount of $139.23. The Trustee incurred, but has not paid, an obligation to the bankruptcy court for filing fees relating to the three adversary proceedings in the amount of $550. All together, the TFR proposes to pay "prorated" administrative expenses allowed in the amount of $9,478.29. Priority and unsecured claims were filed and allowed in the amounts of $59,262.29 and $42,594.92, respectively. However, after prorated payment of the administrative expenses, the Trustee has nothing to distribute to any creditors.

**Issue.**

In a nutshell, the problem here is that this case was originally filed as a no-asset case; after a minimal investigation the Trustee declared it to be an asset case, inducing a few creditors to file proofs of claim, and then he employed an attorney to prosecute three questionable adversary proceedings resulting in a settlement that does not even cover the Trustee's commission and the attorney's fees. After almost four years of work, the Trustee now proposes to close the case, essentially as a no-asset case. The issues before the court are (1) whether the Trustee's employment of counsel and prosecution of the adversary proceedings was a reasonable exercise of his duties under § 704, and (2) whether the resulting legal fees were reasonable, necessary, and beneficial to the estate.

///

---

[6] The Trustee also collected interest in the estate's bank account in the amount of $31.45.

7

**Applicable Law.**

A chapter 7 trustee's duties pertinent to this analysis are prescribed in § 704(1) & (4). The trustee *shall* investigate the debtor's financial affairs, collect the property of the estate, reduce it to money, distribute the money to the creditors, and close the estate "as *expeditiously* as is compatible with the best interests of parties in interest." (emphasis added.) "[A] chapter 7 trustee voluntarily assumes a statutory duty under § 704(1) to collect and reduce the property of the estate for which trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest." *In re C. Keffas & Son Florist, Inc.*, 240 B.R. 466 (Bankr. E.D.N.Y. 1999).

There is an undeniable tension between a trustee's duty to both administer the estate expeditiously, and to maximize recovery from the liquidation of assets. "In short, it is the trustee's duty to both the debtor and the creditors to realize from the estate all that is possible for distribution among the creditors." 6 *Collier on Bankruptcy*, (15th Ed. Revised), ¶ 704.02[3] at 704-12. Conversely, the trustee's duty to expeditiously close the estate has been described by courts as the trustee's "main" duty under § 704. *In re Riverside-Linden Inv. Co.*, 85 B.R. 107, 111 (Bankr. S.D. Cal. 1988), *aff'd.*, 99 B.R. 439 (9th Cir. BAP 1989), *aff'd.*, 925 F.2d 320 (9th Cir. 1991) (citation omitted).

Obviously, in an asset case, the trustee needs a reasonable period of time to investigate the debtor's financial affairs and to gather and liquidate the assets. However, any benefit derived from delay is not without an offsetting cost, *i.e.*, the inevitable injury suffered both by the creditors, as lost opportunity costs, and by the debtors, in delaying their "fresh start." In the administration of a chapter 7 case, the trustee must employ a reasonable approach which balances those costs against the potential benefits.

When the chapter 7 trustee employs an attorney to work for the bankruptcy estate, the standard for compensation of that attorney is defined in § 330(a). Section 330(a)(1)(A) authorizes the court to award "reasonable compensation for actual, necessary services rendered" by the attorney. Section 330(a)(1)(B) authorizes "reimbursement for actual, necessary expenses." Section 330(a)(2) authorizes the court to

"award compensation that is less than the amount of compensation that is requested." The court must find that the compensation is reasonable. Section 330 (a)(3) requires the court to consider "the nature, the extent, and the value of such services, taking into account all relevant factors." Those "relevant factors" include the time spent, the rates charged, and whether the services "were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of" the bankruptcy case.

Even if the court finds that the services billed by an attorney are "actual," meaning that the fee application reflects time entries properly charged as legal services, the attorney must still demonstrate that the work performed was necessary and reasonable. *Unsecured Creditors' Committee v. Puget Sound Plywood, Inc. (In re Puget Sound Plywood)*, 924 F.2d 955, 958 (9th Cir. 1991). An attorney employed under § 327 must exercise good billing judgment with regard to the legal services undertaken. *Id.* at 959. The court's authorization to employ an attorney to work in a bankruptcy case does not give that attorney "free reign [sic] to run up a [legal fee] tab without considering the maximum probable [as opposed to possible] recovery." *Id.* at 958. Prior to working on a legal matter, the attorney is obligated to consider:

> (a) Is the burden of the probable cost of legal services disproportionately large in relation to the size of the estate and maximum probable recovery?
>
> (b) To what extent will the estate suffer if the services are not rendered?
>
> (c) To what extent may the estate benefit if the services are rendered and what is the likelihood of the disputed issues being resolved successfully?

*Id.* at 959.

An attorney employed under § 327 is not held to guarantee the result of those legal services. However, the attorney must demonstrate that the legal services billed to the bankruptcy estate were "reasonably likely to benefit the estate when the services were rendered." §§ 330(a)(3)(A) and (a)(4)(A)(ii)(I); *Roberts, Sheridan & Kotel, P.C. v. Bergen Brunswig Drug Company (In re Mednet)*, 251 B.R. 103, 108 (9th Cir. 2000). "A bankruptcy court also must examine the circumstances and the manner in which services

were performed and the results achieved in order to arrive at a determination of a reasonable fee allowance." *Id.* When a cost benefit analysis indicates that the trustee and his professionals are the only parties likely to benefit from the professional services, then "the service is unwarranted and a court does not abuse its discretion in denying fees for those services." *Id.* at 109.

A chapter 7 trustee's attorney is responsible for his/her role in prosecuting unsuccessful litigation. Even if the trustee made the decision to pursue the litigation in the first place, the attorney at least acquiesced in the decision. *Leichty v. Neary (In re Strand)*, 375 F.3d 854, 859 (9th Cir. 2004). "If the trustee insists on pursuing litigation which is not cost-effective, then the attorney should seek to withdraw or, at least, recommend that the trustee obtain a second opinion." *Id.* citing *Digesti & Peck v. Kitchen Factors, Inc. (In re Kitchen Factors, Inc.)*, 143 B.R. 560, 563 (9th Cir. 1992) (other citation omitted).

Neither the Trustee, nor the United States Trustee has questioned the fact that nobody will receive anything from all the work that was done in this case except the Trustee and Wall. However, the bankruptcy court has an independent duty to review the reasonableness of a professional's fees, even when the trustee who employed that professional does not object. *In re Montgomery Drilling Co.*, 121 B.R. 32, 35-36 (Bankr. E.D. Cal. 1990).

When the facts to support a potential adversary proceeding are discovered by a trustee, the trustee should be prepared to conduct an initial investigation of the facts, utilizing the powers to examine and obtain documents under Rule 2004, if necessary, and make an informed decision whether the facts warrant the employment of a professional to pursue a further investigation. If an attorney is employed to advise and represent the trustee in that effort, that team must prudently expand their investigation of the facts to make sure that the potential claim is sufficiently meritorious to justify the administrative expense and the delay which will result from prosecution of the adversary proceeding. Fed.R.Bankr.P. 9011(b) mandates that that investigation should be done *before* the

10

adversary proceeding is filed.[7]

Even if the trustee's investigation shows that the potential claim has merit, the trustee must be sure that prosecution of the adversary proceeding is reasonably likely to benefit the bankruptcy estate, meaning the creditors will receive some distribution on their claims worthy of the delay and expenses incurred to administer the estate. Congress did not intend that chapter 7 trustees should pursue "nominal" cases, *i.e.*, cases in which the administrative expenses would consume all or virtually all of the nonexempt assets, leaving little or nothing for the unsecured creditors. See 8 *Collier on Bankruptcy*, (15th Ed. Revised), ¶ 1325.05[2][d] at 1325-21, citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 94-95 (1977) (making clear Congress's disfavor of trustees' administration of nominal asset chapter 7 cases, in which the only beneficiaries are those who administer estate).

**Analysis and Conclusions of Law.**

Here, the Trustee and Wall took a no-asset case and filed three adversary proceedings with a minimal investigation of the facts. After deciding to abandon the First and Second Adversary Proceedings, and after the court issued the 522(f) Ruling, the Trustee filed the Third Adversary Proceeding for some reason that Wall was either unable or unwilling to explain when questioned by the court. Upon commencement of the Third Adversary Proceeding, Wall's efforts immediately shifted to negotiation of the Settlement which generated just enough, coincidentally, to cover most of the Trustee's compensation and Wall's attorney fees. In the end, the Trustee's efforts generated nothing for the

---

[7]Rule 9011(b) states in pertinent part:
Representations to the Court. By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, –
   (1) it is not being presented for any improper purpose;
   . . .
   (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery;

creditors of the bankruptcy estate and delayed closure of the case for almost four years.

In the court's view, the work which Wall did preparing and prosecuting the three adversary proceedings had little to no chance of being either necessary or beneficial to the estate. Even if the court were to give Wall the "benefit of the doubt" regarding the legal services rendered early in the case, that "doubt" is dispelled in the court's mind by the Trustee's decision to file the Third Adversary Proceeding after he "did the math" in the Second Adversary Proceeding, and after the 522(f) Ruling (in which the court concluded, in essence, that the Debtor's share of the Residence was worth nothing to the estate). The Settlement which the Trustee extracted from the Debtor in the Third Adversary Proceeding appears to be little more than a "parachute," *i.e.*, a way for Wall and the Trustee to "bail out" of the bankruptcy case with a "soft landing." Wall's time records show that there was no effort to actually litigate the Third Adversary Proceeding. Once it was filed, his efforts turned immediately to negotiating the Settlement. There was nothing in the Settlement for the creditors, despite the Trustee's representations in support of the Settlement that it was in the "creditors' best interest."

At the continued hearing, Wall acknowledged that he did not investigate any of the facts before filing the First Adversary Proceeding. Further, he was unable to point to any facts investigated by the Trustee, or to explain the Trustee's reasons for pursuing any of the adversary proceedings. He stated simply that he "did what the Trustee told him to do." However, Wall's explanation was rejected on similar facts by the 9th Circuit in *In re Strand (supra)*, 375 F.3d 854.

In *Strand*, the chapter 7 trustee employed counsel, Bruce Leichty, Esq., to pursue litigation against the Internal Revenue Service relating to a questionable set-off of money. The litigation produced virtually nothing for the bankruptcy estate and the bankruptcy court disallowed one-half of the fee Leichty requested for the IRS litigation. Leichty argued that he was being unfairly penalized for carrying out the trustee's decision to pursue the IRS litigation in the first place. The Court of Appeals rejected Leichty's attempt to shift the blame to the trustee stating, "Leichty is ultimately responsible for his

12

own actions. . . . Leichty, at the very least, acquiesced in the [trustee's] decision to pursue the IRS litigation. . . . Leichty is responsible for his role in the litigation." *Id.* at 859.

### The "Catch-22."

The court is fully aware of the "Catch-22" here. Had there been no adversary proceedings, there would be no Settlement and no funds to pay Wall for the work he had done in the case. However, a bankruptcy trustee should never prosecute an adversary proceeding solely to extract a settlement from the defendant(s). This was first and always a no-asset case. Once the Trustee learned about the Residence, he could have done more to investigate the facts before employing an attorney. Once the Trustee approached Wall about representing the estate, Wall could have reviewed the available evidence and/or insisted on more investigation before he agreed to that employment. Given the "joint tenants" title to the Residence, Wall should have evaluated the evidence and the legal authority upon which the court ultimately based its 522(f) Ruling and done some further discovery to determine if the estate really had anything in the Residence to sell. Unfortunately, nonpayment for unsuccessful litigation is one of the risks inherent in the representation of trustees in bankruptcy cases.

The solution to that problem lies in Rule 9011. The trustees and their professionals have a duty to reasonably investigate a potential claim for relief *before* filing the adversary proceeding. First, the trustee should be trained and equipped to do enough discovery - utilizing if necessary the § 341 meeting, Rule 2004 examinations, and the production of documents - to determine whether the employment of an attorney is warranted. The attorney should not accept that employment without carefully reviewing the case. Once employed, the attorney accepts some risk of success. The professional's risk is minimized by an early and efficient investigation of the facts, not by demanding a "parachute" settlement to bail out of unwarranted litigation after it is filed.

### Conclusion.

Based on the foregoing, the court finds and concludes that the employment of general counsel in this case, and the pursuit of three adversary proceedings against Mary

13

Reid, was not a reasonable exercise of the Trustee's duties under § 704. The Trustee could have conducted a more comprehensive investigation of the Residence before he declared this be to an "asset case" and employed Wall to embark on a three-year odyssey of litigation. Once employed, Wall could have conducted a reasonable investigation of the Debtor's interest in the Residence and advised the Trustee that it was probably not worth pursuing. Certainly after the court issued the 522(f) Ruling, there appeared to be no reason for further litigation with regard to the Residence. If Wall did not concur in the Trustee's decision to pursue the adversary proceedings, then Wall should have withdrawn as counsel. *In re Strand*, 375 F.3d at 859. When a cost benefit analysis indicates that the trustee and his professionals are the only parties likely to benefit from the professional services, then "the service is unwarranted and a court does not abuse its discretion in denying fees for those services." *Id.* at 109.

Dated: August 26, 2008

_____
W. Richard Lee
United States Bankruptcy Judge